IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LEA ELMALECH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 CV 4995 |
| | ) | |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Lea Elmalech ("Elmalech" of "claimant"), has filed a motion for summary judgment [10] seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). The Commissioner denied Elmalech's claim for disability benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). The Commissioner filed a response [16] asking this Court to affirm the decision of the Administrative Law Judge. We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Elmalech's motion for summary judgment is granted.

I.  BACKGROUND

A.  Procedural History

Elmalech filed an application for Disability Insurance Benefits ("DIB") on January 18, 2007 alleging chronic dizziness and an onset date of June 1, 1993. (R. 11, 121-23.) Her application was denied initially on March 21, 2007 (R. 57-61), and again on May 25, 2007 after a request for reconsideration. (R. 62-68.) Elmalech then filed a timely

request for a hearing. (R. 69.) Elmalech appeared with counsel at a hearing on April 15, 2008 before Administrative Law Judge Robert Karmgard ("ALJ" or "ALJ Karmgard"). (R. 21-54.) A continued hearing was held on September 4, 2008, also before ALJ Karmgard. (R. 411-479.)

On October 1, 2008, ALJ Karmgard issued a written decision denying Elmalech's request for benefits. (R. 8-20.) Elmalech filed a timely request for review of the ALJ's decision. (R. 5-7.) The Appeals Council denied Elmalech's request for review on June 23, 2009 (R. 1-3), and ALJ Karmgard's decision became the final decision of the Commissioner. *See Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). This action followed.

**B. Medical History**

**1. Records Prior to Date Last Insured**

There are no medical documents in the record from the period prior to claimant's date last insured, June 30, 1995. The record does contain a handwritten note from Dr. Herbert R. Lang, dated August 28, 2008, which reads: "Mrs. Elmalech was a patient of mine in the 1980s -1990s. Old records could not be located. I do remember she had major issues with chronic dizziness." (R. 410.) In a letter to the ALJ dated June 24, 2008, claimant's counsel reported that Dr. Lang's office only keeps records for approximately 10 years and, for this reason, she was unable to obtain records dating back to the 1990s. (R. 193.)

**2. Records Following Date Last Insured**

**a. Rush North Shore Medical Center**

Elmalech underwent cardiac testing at Rush North Shore Medical Center

("Rush") on September 19 and 26, 1996. (R. 232-36.) At the September 19 testing, "exercise was stopped due to dizziness when the patient jump[ed] off treadmill on her own." (R. 235.) The results of the cardiac testing reveal a diagnosis of angina, but no significant abnormalities. (*Id.*) A February 19, 1997 CT scan of claimant's paranasal sinuses, performed at the North Shore CT Center, was normal "except for a tiny solitary left ethmoid air cell" and a "possible small polyp." (R. 409.)

Claimant was hospitalized at Rush on December 24, 1998 due to complaints of chest pain. (R. 202.) The emergency department admitting physician, Dr. Stephanie R. Black, noted multiple cardiac risk factors, including "hypertension, diabetes, [and] obesity." (R. 202.) Dr. Black also noted a prior history of glaucoma. (*Id.*) Cardiac testing performed during Elmalech's hospital stay revealed mild cardiomegaly, normal sized aorta and pulmonary vessels, no definite reversible lesions, and clear lungs. (R. 213-214.) Claimant was discharged on December 26, 1998 with a final diagnosis of "chest pain, probably non-cardiac in origin," non-insulin dependant diabetes mellitus, and exogenous obesity. (R. 199.) A follow up cardiac stress test in January 1999 revealed no significant abnormalities. (R. 227.)

Elmalech underwent neurovestibular testing in December 1999 and July 2000. (R. 221-25.) Neither test revealed any significant abnormalities. (*Id.*) A sinus CT scan performed at some point in 2000 (date illegible) proved generally unremarkable. (R. 408.)

### b. Evanston Northwestern Healthcare

On March 10, 2003, at an appointment with Dr. Hoyee Chan of Evanston Northwestern Healthcare Medical Group ("ENH Medical Group"), claimant presented

3

with a several-month history of dizziness, which had worsened over the preceding one and a half weeks. (R. 262.) Specifically, Elmalech reported "feeling herself spinning" with change of head and body position. (R. 262.) She also reported associated head pressure, neck pain, and an unsteady gait. (*Id.*) On March 17, 2003, Elmalech reported that her dizziness was 10% better and that Xanax provided minimal relief. (R. 263.) On March 27, 2003, claimant reported dizziness with associated ringing of her ears. (R. 264.) As of May 2003, her dizziness had improved with walking and eye exercises. (R. 265.) On June 3, 2003, claimant explained that her dizziness also improved at times with the help of medication. (R. 266.) At a follow-up appointment on June 24, 2003, Elmalech again reported a slight improvement. (R. 364.)

At a routine visit on July 22, 2003, Elmalech complained of increased dizziness over several days. (R. 360.) She denied any headaches or "room spinning," and was able to walk without an unsteady gait. (*Id.*) At her appointment on September 9, 2003, claimant reported experiencing dizziness while sitting in the waiting room that day, but further reported that she was walking daily without dizziness and that she planned to start walking with a girlfriend. (R. 356.) On October 16, 2003, Elmalech claimed she started walking one mile a day in September of 2003. (R. 352.)

Claimant was admitted to Evanston Northwestern Healthcare's Glenbrook Hospital on October 24, 2003 with a complaint of dyspnea on exertion and left arm heaviness. (R. 240.) An EKG revealed mild aortic insufficiency and mild to moderate mitral regurgitation. (R. 251.) It appears claimant was discharged on the day of admission. (R. 249.)

Claimant continued her periodic visits to the ENH Medical Group from late 2003

4

through 2006. (R. 269-350.) As of November 13, 2003, claimant's dizziness had reportedly improved (R. 344), although records indicate a complaint of "increased dizziness with change of position" on December 11, 2003 (R. 340) and that her dizziness remained present on December 30, 2003. (R. 336.) The records further reveal that claimant tried acupuncture and herbal medications in hopes of improving her symptoms.[1] (R. 332, 336, 380-87.) On January 29, 2004, Elmalech reported that the acupuncture did provide some relief. (R. 327.) She also reported that her dizziness was associated with pressure at the back and front of her head. (*Id.*) Records from a March 11, 2004 follow-up appointment include a note that claimant's dizziness may be related to hypertension. (R. 318.) Medication compliance, as well as increased walking, was advised. (*Id.*)

Claimant continued to complain of dizziness at appointments on April 8, 2004, June 17, 2004, September 11, 2004, February 24, 2005, March 3, 2005, December 6, 2005, June 8, 2006 and December 22, 2006. (R. 269-315.) On April 8, 2004 claimant stated that her dizziness caused her to sit down for several hours, but that "walking does not increase her dizziness." (R. 314.) Claimant repeatedly reported a decrease in her dizziness as a result of her Ativan medication and vitamins, and an increase as a result of various stressors in her personal life. (R. 271, 282, 289, 294, 299, 304.) At several appointments, Elmalech informed her doctor that she had been walking, sometimes daily, and hoped to join a fitness center in an attempt to lose weight. (R. 271, 276.) At her December 22, 2006 appointment, claimant denied "any room

---

[1] The records from acupuncturist Claudette Baker are included in the record. (R. 380-87.) On the patient intake form, claimant's reason for seeking acupuncture is listed as "dizziness," which she reports developed "a few years back." (R. 381.) She further reported that "every movement of my body makes it worse" and that she "can't do all kinds of exercise." (*Id.*)

spinning," but reported that nasal stuffiness and mild neck pain accompanied her dizziness. (R. 271.)

### C. Claimant's Testimony

Elmalech was born on September 9, 1947 and was 60 years old at the time of the September 4, 2008 hearing. (R. 421.) She testified that she lives with her husband in Wilmette, Illinois. (*Id.*) Elmalech completed two years of college, is able to read and write, and has no problems with basic mathematics. (*Id.*) At the time of the hearing, she was approximately 5'11" and 270 pounds. (R. 422.) At all relevant times, claimant has held a valid driver's license, with no restrictions. (R. 422-23.)

Claimant worked in family owned restaurants from 1981-1993 as a manager, hostess and cashier, although her husband primarily performed the supervisory duties. (R. 429-31, 433-34.) Of the eight hours she worked a day, she was on her feet for two to three hours. (R. 432.) She did not have to lift anything as a hostess or cashier. (*Id.*) When working in 1993, claimant testified that she would often go home early or leave for a few hours during the day and return in the evening. (R. 430, 432, 453.) Claimant stopped working in June 1993 due to her on-going symptoms of dizziness and has not worked since. (R. 426, 434.)

Claimant testified that she started encountering dizziness in the early 1980s, but that it got worse in 1993, and worse still in 1995. (R. 423, 440.) In the '80s, her dizziness could be caused by focusing for a long time, turning her head or bending down. (R. 423-24.) She testified that since 1993, her dizziness is present, on an off and on basis, throughout the day. (R. 425.) Since 1993, it could be caused by focusing, turning or walking for as little as five minutes. (R. 425-26.) It can also be

triggered by fumes, objects moving across her line of site, watching television, or even when she is just sitting still. (R. 435, 450, 455.) She testified that since at least 1993, episodes of dizziness occur every day and last for approximately forty-five minutes to one and a half hours. (R. 426-27.) Claimant's dizziness has been accompanied with a sharp pain in her head and neck since 1994 or 1995 and with a ringing in her ears since sometime in the 1990s. (R. 445-48.) At some point prior to 2000, claimant's dizziness became occasionally associated with a blurring of vision. (R. 449.) Since as far back as she was working, her dizziness has always been accompanied with nausea. (*Id.*)

Claimant testified that she started taking Lorazepam for her dizziness at some point after 2000, and maybe as late as 2005. (R. 443-44.) She claimed that it does not help decrease her dizziness. (R. 444.) Claimant denied ever taking Ativan. (R. 443.)

During her dizzy spells, claimant sits in silence in a dark room, sometimes for as long as a couple of hours. (R. 448-49.) Claimant testified that since at least June 1993 she has been unable to read or write for periods of over five minutes and has difficulty focusing. (R. 451-52.) When questioned about exercise, claimant testified that in the early 1990s she could walk for no more than twenty minutes. (R. 436.) At the time of the hearing, and since the late 1990s, she could not walk for longer than five minutes. (*Id.*) Claimant denied ever telling her physicians that she was walking a mile a day in 2003 and did not recall any of her doctors suggesting that walking may help with her dizziness. (R. 437.) At the time of the hearing, and since before 2000, claimant stated that she could only stand for twenty minutes to a half an hour before starting to sway. (R. 456.) When asked how much weight she could carry by herself, claimant could not answer because she does not lift anything. (*Id.*) She testified that the heaviest thing

7

she picked up during the day around the house probably weighed three to five pounds. (*Id.*)

Claimant has been and remains able to wash dishes, dust, vacuum, and do laundry, with the assistance of her husband. (R. 438.) She cannot perform tasks that require bending. (*Id.*) Presently, and over the past few years, she has driven to the store once a week for groceries without difficulty. (R. 434.) The store is approximately five minutes away. (*Id.*) Claimant added that she presently drives four to five times a week to her daughter's house to visit with her daughter and grandchildren. (R. 435.) The trip takes about twenty minutes and her husband sometimes drives. (*Id.*) Since 1997 or 1998, she has not been able to go to the shopping mall because she immediately gets dizzy. (R. 450.) Claimant spends most of the remainder of her time sitting at home. (R. 434.)

Claimant also testified that she was diagnosed with diabetes about ten years ago, but that it does not cause any particular problems. (R. 441.) She also suffers from hypertension and arthritis in her hands. (R. 441, 453.)

### D. Testimony of Claimant's Daughter

Claimant's daughter, Anat Young ("Young") (improperly identified as Annette Young throughout the record), testified at the initial hearing before the ALJ on April 15, 2008. (R. 21-54.) Young testified that her mother was a manager, hostess and cashier at the restaurant prior to leaving work in approximately 1993. (R. 33.) According to Young, claimant worked five days a week, but would leave work early three to four times a week on average due to her dizzy spells. (R. 33-34.) During these dizzy spells, Young testified that her mother would remain motionless and start holding onto the

8

countertops, furniture or Young's arm to avoid tipping over. (R. 34.) If Young was nearby, she would help her mother to a chair. (*Id.*) Her mother would sometimes sit in a dark room, which would provide temporary relief. (R. 48-49.) Young testified that her mother's dizziness was always accompanied with shooting pains in her head and neck and a ringing in her ears. (R. 36, 46-47, 49, 51-52.) She said that her mother would grab her temples or the back of her head a lot and would sometimes grab her ears. (R. 46, 50.) In Young's opinion, claimant's' dizziness was also accompanied with nausea most of the time. (R. 49.)

As to causation, Young testified that her mother's dizziness could be caused by movements such as turning her torso, rotating her head, bending over or walking for as little as five minutes. (R. 36, 42-44.) The dizziness could also occur when her mother was sitting down. (R. 35-36.) Additionally, Young testified that claimant's dizziness was triggered if other people or objects moved across her line of vision, either quickly or slowly. (R. 45-46.) With respect to frequency, Young testified that she recalled observing her mother's dizzy spells as early as 1985, anywhere from three to four times a day. (R. 39.) At the time her mother was working in 1993, Young testified that the dizzy spells occurred on average five to seven times a day, and would last approximately thirty minutes. (R. 40.) Young testified that her mother currently has at least five to seven dizzy spells a day and that the dizziness "definitely became worse as time progressed." (R. 41.)

### E. Testimony of the Vocational Expert

Vocational Expert Richard Willett ("VE" or "VE Willett") testified at the continued hearing before the ALJ on September 4, 2008. (R. 458-78.) Citing the Dictionary of

Occupational Titles ("DOT"), VE Willett described claimant's past work as a hostess as light and semi-skilled and her past work as a cashier as light and unskilled. (R. 459-60.) Combined in one position, as they were here, VE Willett described the work as light and semi-skilled. (R. 460.)

The ALJ asked VE Willett to consider a hypothetical person of the same age as claimant, with the same education and past relevant work, but with the following limitations: lifting and carrying up to a maximum of 50 pounds on an occasional basis, and 25 pounds frequently; sitting, standing and walking with normal breaks for up to six hours each within an eight hour day; no climbing ladders, robes or scaffolds; may otherwise climb ramps or stairs, balance, stoop, kneel, crouch and crawl, on no more than a frequent basis; and must avoid exposure to hazards such as exposed unprotected heights or excavations, as well as exposed unprotected dangerous moving machinery. (R. 460-61.) VE Willett explained that such an individual could perform claimant's past work as a hostess and cashier. (R. 461.) The VE also testified that the individual could perform a wide variety of medium jobs, such as manufacturing helper or vendor, and light jobs, such as bench assembler or attendant. (R. 461-63.)

The ALJ then asked VE Willett to consider the same hypothetical individual with the additional limitation of having to avoid concentrated exposure to fumes, odors, dust, gases and other pulmonary irritants. (R. 463.) The VE explained that this would have no impact on the individual's ability to perform claimant's prior work, but would eliminate the manufacturing helper position. (R. 463-64.) According to the VE, this individual could work as a medium level machine feeder. (R. 464.)

The ALJ then continued with a third hypothetical and added the following

modifications to the individual: lifting and carrying would need to be limited to a maximum of 20 pounds on an occasional basis, and 10 pounds frequently; sitting, standing, and walking would remain the same; the prohibitions on climbing ladders, ropes or scaffolds would remain the same; and the individual may climb ramps and stairs, balance, stoop, bend, kneel, crouch and crawl, on no more than an occasional basis. (R. 464-465). VE Willett testified that this individual would be able to perform claimant's past relevant work as a hostess and cashier and could perform the light level jobs identified above, but would be unable to perform the medium jobs previously discussed. (R. 465.)

The ALJ limited the individual further as being unable to perform work that requires "the watching or monitoring of objects which would move rapidly across the line of sight." (*Id.*) VE Willett testified that the individual could perform claimant's past work, and could work as a vendor, attendant, office helper, clerical addresser, or information clerk. (R. 465-66.) If the individual could only lift a maximum of ten pounds occasionally, she could perform claimant's past work, and perform the sedentary jobs of information clerk and clerical addresser. (R. 468.) Should the individual be able to stand and walk for only two hours within the eight hour day, she would be unable to work as a hostess or cashier, but could work in the sedentary positions. (*Id.*) If the individual must avoid work which would require rapid movement of the head from side to side, VE Willett testified that she could work as an attendant, vendor, office helper, information clerk or addresser. VE Willett indicated that all jobs would be eliminated if the individual did not have the capacity to sustain the activities of work, including lifting, carrying, sitting standing, or walking, for a combined total of six hours in an eight hour

11

day. (R. 469-70.)

## II. LEGAL ANALYSIS

### A. Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but we will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*per curiam*) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis Under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits depends on whether claimant is "disabled" under the Social Security Act (the "Act"). A person is

12

disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 886. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "claimant is capable of performing work in the national economy." *Id.* at 886.

ALJ Karmgard followed this five-step analysis. At step one, the ALJ found that the claimant had not engaged in substantial gainful activity at any time relevant to his decision. (R. 18.) At step two, the ALJ found that claimant had the following severe impairments: "diabetes mellitus; a history of glaucoma; and vestibular dysfunction, with a history of dizziness." (*Id.*) At step three, the ALJ determined that claimant "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1." (*Id.*)

Next, the ALJ found that, as of the date last insured, June 30, 1995, claimant had the residual functional capacity ("RFC") to "lift and carry up to 20 pounds, occasionally, and 10 pounds, frequently," and could "sit, stand, and walk, respectively and with

13

normal breaks, for up to six hours each in an eight-hour workday." (*Id.*) He also found that claimant "could not climb ladders, ropes or scaffolds, but could otherwise climb ramps and stairs and could balance, stoop, kneel, crouch, and crawl, no more than occasionally." (*Id.*) Further, the ALJ found that claimant could not perform work that "required the watching or monitoring of objects that move rapidly across (and perpendicular to) the line of sight (such as or a conveyor belt)" or work that "required rapid movement of the head from side to side." (R. 18-19.) At step four, ALJ noted that claimant had no prior work in the 15 years preceding the hearing of September 2008, but that she did work within the 15 years proceeding her date last insured. In any event, the ALJ found that "insofar as there exist a significant number of jobs which would be performed by claimant, the issue of capacity to perform prior work need not be resolved and is reserved." (R. 17-18.) Finally, at step five, the ALJ found that there were a significant number of jobs in the national economy that claimant could perform, including attendant, office helper, information clerk and addresser. (R. 18-19.)

Claimant now argues that the ALJ failed to properly analyze hearing testimony and evidence regarding plaintiff's symptoms prior to her date last insured. Claimant also argues that the ALJ erred in failing to recontact Dr. Lang regarding his August 2008 handwritten note. Finally, claimant argues that the ALJ failed to perform the analysis required by SSR 83-20 to determine the onset of disability. Because we find the ALJ's failure to re-contact Dr. Lang the most egregious error, we address that issue first.

**C.   The ALJ Erred in Failing to Recontact Dr. Lang Regarding his August 2008 Note**

As mentioned above, included in the administrative record is a handwritten note from claimant's former treating physician, Dr. Lang. (R. 410.) The ALJ addressed the

14

note briefly in his opinion stating:

> In a August 28, 2008 report, Dr. H. Lang noted that the claimant had been his patient during the 1980s and 1990s. Dr. Long also stated that he recalled that, during this period of time, the claimant had major issues with chronic dizziness. The dates of first and last treatment are not identified. Similarly unidentified are the causes, nature, frequency, duration, and extent of symptoms, although counsel for the claimant had, per the hearing report, regularly requested such information from the doctor.
>
> In addition, the records of Dr. Lang contained no information regarding specific limitations upon work activity (e.g., lifting, standing or walking) or the duration thereof. According to the source, records of treatment could not be located.

(R. 14-15.) The ALJ did not discuss Dr. Lang's note or his recollection of claimant's chronic dizziness at any other point in his opinion. Claimant argues that the ALJ should have recontacted Dr. Lang to resolve some of the ambiguities and missing information he takes issue with in his opinion. In response, the Commissioner argues that the ALJ had no duty to recontact Dr. Lang because claimant's counsel informed the ALJ that "Dr. Lang did not respond to her requests for additional information." (Resp. at 4, n.1). We disagree.

We do not dispute that the burden to produce records and evidence in support of a disability lies with the claimant. *See* 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled.") Nonetheless, the ALJ has a duty to develop a full and fair record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). Where evidence received from a treating physician or other medical source is inadequate to determine whether a claimant is disabled, the Social Security Administration "will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available." 20 C.F.R 404.1512(e)(1). The

15

Administration will also seek additional evidence or clarification from a medical source when the "report contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Id.*

Here, the only evidence regarding plaintiff's condition prior to the date last insured came from the testimony of claimant and her daughter. It is undisputed that Dr. Lang's treatment records from that period are no longer available due to the passage of time. (R. 193, 419.) However, it is not clear that Dr. Lang is unable or unwilling to provide additional information in the form of questions from the ALJ or otherwise. *See* 20 C.F.R § 404.1512(e)(2) ("We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings."). In fact, although the ALJ stated that claimant's counsel "regularly requested" additional information from Dr. Lang, this statement is not entirely supported by the record. At the hearing, counsel simply mentioned that she had not had "much luck having Dr. Lang fill out forms." (R. 419.) Unfortunately, the ALJ did not question counsel further as to the number of failed attempts, whether Dr. Lang ever indicated that he did not recall any additional information, or whether he simply did not respond to her requests. Further, claimant's counsel even suggested that perhaps the only other way she could get Dr. Lang's opinion would be if the ALJ sent him "some questions." (*Id.*)

On this record, where Dr. Lang is seemingly the only treating medical source from the period prior to the date last insured, we find that the ALJ erred in failing to recontact him to determine whether he had any additional information, which could

16

clarify the very ambiguities the ALJ relied upon when discrediting Dr. Lang's note. *See Reid v. Astrue*, 2011 WL 1485276, at *13 (N.D. Ill. April 19, 2011) (citing 20 C.F.R. 404.1512(e)(1) and noting that "the fact that the ALJ indicated that the time period [a treating source's] report addressed was 'unclear' reveals the presence of an ambiguity that the ALJ was required to resolve"); *Thompson v. Astrue*, --- F.Supp.2d ----, 2011 WL 124511, at *5 (N.D. Ind. Jan. 13, 2011) (same); *see also Barnett v. Barnhart,* 381 F.3d 664, 669 (7th Cir.2004) (holding that the ALJ should have contacted the plaintiff's doctor and asked for more detail regarding the frequency of claimant's seizures). As such, this case is remanded for further proceedings consistent with our finding.

### D. The ALJ's Credibility Determinations

Although we have already found that the ALJ's failure to recontact Dr. Lang is an independent basis for remand, we briefly address claimant's arguments regarding the ALJ's credibility determinations. It is well settled that the ALJ is in the "best position to see and hear the witnesses and assess their forthrightness" and, as such, a reviewing court affords the ALJ's credibility finding special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The court may only disturb a credibility finding if it is "patently wrong," that is, unreasonable or unsupported. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Despite this deferential standard of review, recent Seventh Circuit precedent confirms that an ALJ's use of the boilerplate language used here, without more, is perfunctory.[2] *See e.g. Spiva v. Astrue,* 628 F.3d 346 (7th Cir.2010); *Parker v. Astrue*,

---

[2] With respect to claimant's credibility, ALJ Karmgard stated:

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible. The claimant's complaints of limitations are not supported by the medical

17

597 F.3d 920 (7th Cir.2010).

The ALJ's analysis of claimant's credibility, while imperfect, is not fatally flawed. Despite the boilerplate language, the Analysis of Record section provides further insight into the ALJ's credibility determination. Among other things, the ALJ states, "the reported onset of dizziness symptoms in 2003 is not indicative of the existence of or severity of any particular form of symptomatology during the period from 1993 through the June 1995 date last insured." (R. 16.) In short, the ALJ took issue with the lack of contemporaneous medical evidence claimant presented in support of her alleged disability. He also identified certain inconsistencies in the record. For example, the ALJ noted that despite testimony that her dizziness dates back to the 1980s, none of the records include a discussion of symptomatology from an earlier period, and the acupuncturist's records from 2003 indicate that claimant reported that her dizziness only dated several years back. (R. 16.) The ALJ also noted that claimant has at all times had a valid driver's license and drives twenty minutes four times a week to her daughter's house.[3] (R. 13-14.)

In any event, recognizing that further proceedings on remand will require a new credibility assessment, the ALJ should take care to fully comply with the requirements of SSR 96-7p and to provide a proper explanation for his determination. In doing so, the ALJ is reminded that "the absence of an objective medical basis which supports the

---

record, as discussed under the Analysis of Record, above. (R. 19.)

[3] Claimant also takes issue with the ALJ's reliance on September 1996 records of cardiac testing. (R. 232-36.) The ALJ commented that "no specific reference to ongoing or current symptoms of dizziness is reported" in those records. (R. 15.) We note that the records do in fact contain a reference to dizziness in that one round of testing was stopped when claimant jumped off the treadmill "due to dizziness." (R. 235.)

18

degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." *Scheck v. Barnhart*, 357 F.3d 697 (7th Cir. 2004) (quoting *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984)). The other factors to be considered by the ALJ are: (1) the claimant's daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Id.*

With respect to the testimony of claimant's daughter, the ALJ did not make a credibility determination or discuss the weight he gave her testimony, if any. Instead, the ALJ briefly recited portions of her testimony, which we note, as did claimant, are consistent with claimant's testimony and speak to claimant's purported impairments and limitations prior to the date last insured. On remand, because the ALJ is required to consider all evidence relevant to the claim, *see* 20 C.F.R § 404.1527(b), the ALJ should take care to explain the weight given to Young's testimony or to "otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning..." *See* SSR 06-03p.

### E. The ALJ Did Not Err in Failing to Perform the Analysis Required by SSR 83-20.

Lastly, so that the record is clear on remand, we reject claimant's argument that the ALJ erred in failing to perform the analysis required by SSR 83-20. That ruling "addresses the situation in which an administrative law judge makes a finding that an individual is disabled as of an application date and the question arises as to whether the disability arose at an earlier time." *Scheck,* 357 F.3d at 701. Where, as here, the ALJ did not find that claimant was disabled either at the time of application or earlier, SSR

19

83-20 does not apply.

## III. CONCLUSION

For the reasons set forth above, Elmalech's motion for summary judgment is granted. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

ENTERED:

*/s/ Michael T. Mason*

**MICHAEL T. MASON**
**United States Magistrate Judge**

Dated: June 10, 2011